## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

MARVIN J.,[1]

               Plaintiff,

v.                                      ACTION NO. 2:20cv356

KILOLO KIJAKAZI,[2]
Acting Commissioner of Social Security,

               Defendant.

### UNITED STATES MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Marvin J. ("plaintiff") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying his claims for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 11. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment (ECF No. 13) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 15) be **GRANTED**.

---

[1]  In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. COMM. ON CT. ADMIN. & CASE MGMT. JUD. CONF. U.S., PRIVACY CONCERN REGARDING SOCIAL SECURITY AND IMMIGRATION OPINIONS 3 (2018).

[2]  Kilolo Kijakazi is the Acting Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). *See also* section 205(g) of the Social Security Act, 42 U.S.C § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

## I.   PROCEDURAL BACKGROUND

Plaintiff's current claim arose from his February 5, 2019 protective filing and later application for disability insurance benefits, alleging disability beginning December 1, 2018, due to post-traumatic stress disorder ("PTSD"), traumatic brain injury ("TBI"), depression, degenerative arthritis, fibromyalgia, and cervical paraspinal tendinitis.[3]   R. 185–86, 242. Plaintiff's date last insured for purposes of disability insurance benefits is December 31, 2023. R. 239.

After denial of the plaintiff's claim initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").   R. 88–119, 140–41.   ALJ Kerith Cohen heard the matter on December 4, 2019, and issued a decision denying benefits on January 16, 2020.[4]   R. 12–33, 35–64.   On May 14, 2020, the Appeals Council denied plaintiff's request for review of the ALJ's decision.   R. 1–6.   Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.   *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Plaintiff filed a complaint on July 3, 2020.   ECF No. 1.   After receiving two extensions of time, the Commissioner answered on January 13, 2021.   ECF No. 9.   The parties filed motions for summary judgment, with supporting memoranda, on February 12 and March 12, 2021, respectively.   ECF Nos. 13–16.   Plaintiff filed a reply brief on March 24, 2021.   ECF No. 17.   As oral argument is unnecessary, the case is deemed submitted for a decision.

---

[3] Page citations are to the administrative record that the Commissioner previously filed with the Court.

[4] At this hearing, and before the Court, plaintiff has been represented by Robert Gillikin, II, Esquire.   R. 35.

2

## II.   RELEVANT FACTUAL BACKGROUND

### A.   *Background Information and Hearing Testimony by Plaintiff*

At the time he testified before the ALJ on December 4, 2019, plaintiff was 43-years-old and living with his wife and three of his children, with a fourth child in college. R. 40. Plaintiff graduated high school and served 22 years in the U.S. Navy, serving as an aircraft handler, preparing for the launching and landing of aircraft on carriers. R. 27, 41, 54, 244, 756. Department of Veterans Affairs ("VA") treatment notes discussed below indicate plaintiff experienced military-related, traumatic stressors to include witnessing his friend's decapitation during an aircraft landing on a carrier in 2008, and witnessing a tire rolling over a fellow servicemember's leg in 2014. R. 752–53.

Plaintiff was honorably discharged from the U.S. Navy on November 30, 2018. R. 243. Plaintiff testified that he "didn't do much of anything" for the military during his last four years of service aside from attending his medical appointments, his psychiatric appointments, and morning meetings. R. 41; *see also* R. 55 (reflecting plaintiff's testimony that he left the military due to his depression, anxiety, and worry over where he might get stationed).[5] The VA initially diagnosed plaintiff with PTSD in approximately February 2017, and assigned plaintiff a service-connected, disability rating for PTSD on or about January 12, 2019. R. 159, 755. Plaintiff attributed his inability to work following his discharge from the military to severe depression, anxiety, and

---

[5] In a March 2019 function report, plaintiff indicated that, during his last eight years in the U.S. Navy, he was relieved of all leadership duties and only worked jobs where he was by himself. R. 297. Similarly, plaintiff indicated in a disability report completed in February 2019, that he had been an "air load planning instructor" for fifteen years, supervising four other servicemembers, until he became unable to work. R. 244.

3

fibromyalgia. R. 42 (explaining "every day is just a struggle . . . it's a struggle to stay alive sometimes").

In his March 2019 function report, plaintiff reported that "before [his] tragic experience," he "was able to live a normal life," including performing his job, interacting with his family, cooking, cleaning, doing yard work, and taking care of his children. R. 292. Due to his chronic PTSD, his wife "has had to assume completely all responsibilities." *Id.* Plaintiff reported insomnia and "re[]curring nightmares on a nightly basis" for which he takes medications that "don't work." *Id.* Plaintiff indicated his wife has to encourage him to take care of his personal hygiene, and organizes his medications. R. 292–93. Plaintiff indicated he occasionally mows the lawn, performs light household cleaning, and does laundry under his wife's strict supervision, but each takes all day due to the effects of medication and panic/anxiety attacks. R. 293. He does not have any hobbies or interests and lacks motivation due to depression. R. 295.

Plaintiff reported "get[ting] really paranoid around large crowds," avoiding public places, and "freak[ing] out on people." R. 294. Plaintiff reported that he "hate[s] other people [and] most people are out to get [him]," "most of the time [he] does not even like [his] family," and he is "just lucky to get through the day without hurting [himself] or others." R. 295. He does not handle money, budget, or pay bills due to difficulty concentrating and remembering. R. 294–95. He reported he can pay attention for 5–15 minutes, his ability to follow written or spoken instructions is "not so good," he does not handle change "well at all," he is "very argumentative," and he does not get along or relate to co-workers or authority figures. R. 296–98.

At the time of his hearing, plaintiff was attending group mental health counseling one time per week at the VA, which he found helpful. R. 45–46. Plaintiff had not driven in over ten years

4

due to flashbacks and hallucinations, and relied exclusively on his wife for transportation. R. 40, 46.[6] Plaintiff testified that on a typical day, he lays around and tries to sleep as much as possible due to depression. R. 49–50. His wife encourages him to take a shower, brush his teeth, and put on clothes other than pajamas. R. 50–51, 54. He watches the news, but does not have the attention span to read. R. 51–52. His wife attempts to get him out of the house, but riding in the car causes flashbacks and hallucinations. R. 50. With respect to household chores, cutting the grass takes all day due to a lack of energy, and his wife does not allow plaintiff to prepare meals as a result of his suicidal thoughts. *Id.*

With regard to alcohol consumption, plaintiff reported in the March 2019 function report that "since [his] illnesses, injuries, or conditions began," he drinks alcohol more often and in greater volume. R. 296. Plaintiff testified that he has issues with alcohol, but he had been drinking less since he began individual therapy with the VA in May or June, 2019. R. 47; *see* R. 782–84. Plaintiff explained the drinking intensified his nightmares, which became less intense when he cut back to two or three beers. *Id.* He further indicated that alcohol did not mix well with his medications and "made things worse." R. 48. Plaintiff testified that his medications make "a big difference," and reduce the frequency of his flashbacks. R. 48–49. Plaintiff also experienced hallucinations once or twice each day. R. 49. Plaintiff testified that he has had some improvement in outbursts due to anger. R. 55–56 (recalling punching a wall when his kids fight or slam a door, and ripping his wife's car visor off when "she said something stupid and silly").

---

[6] In March 2019, plaintiff reported to the VA that he had five DUI's between 2003 and 2015, but that his license had not been revoked. R. 756. He stated that he had carpooled with his wife since 2009 as a result of the "drunk driving." *Id.*

5

With respect to his physical limitations, plaintiff testified that he aches "every day, all day long" due to "nerve damage in [his] neck all the way down to [his] fingertips and down to [his] feet." R. 42. Plaintiff testified he can stand for 10 to 15 minutes before needing to sit due to pain in his joints, spine, and back. R. 42–43. Plaintiff can sit for 30 minutes before needing to get up. R. 43. He is limited to lifting and carrying 10 to 15 pounds due to nerve damage in his forearms and hands that make gripping difficult, which is worse in his dominant, right hand. R. 43–44. Medications make him drowsy sometimes and the medication he takes for nightmares can exacerbate them causing insomnia. R. 44. He wears braces and inserts for his feet "[j]ust about every day." R. 44–45.[7]

## B.   *Hearing Testimony by Vocational Expert*

Barbara Byers, a vocational expert ("VE"), also testified at the hearing. R. 57–63. Based on the ALJ's hypotheticals, VE Byers opined that work, other than plaintiff's past relevant work, would be available for someone with plaintiff's age, education, and past work experience, with the following functional capacities. The first two hypotheticals described a person who could perform light work with certain limitations.[8]  VE Byers opined that person could perform work sorting

---

[7] In his March 2019 function report, plaintiff indicated he could lift 50 pounds, walk ½ mile before needing to rest for 5 minutes, stand for 10 minutes, and sit for 10–30 minutes. R. 296. He reported significant hearing loss in his right ear and vertigo. *Id.* He reported putting arthritis gel on his joints twice daily for pain and wearing orthotic shoe inserts. R. 296–97.

[8] The first hypothetical person could stand and walk for four hours and sit for four hours in a workday; occasionally operate foot controls; frequently handle and finger; and frequently perform all other postural activities. R. 58. He could not climb ladders, ropes, or scaffolds; and could not work around hazardous machinery or unprotected heights. *Id.* He could understand, remember and carry out simple instructions and work in a low-stress job with only occasional need for work-related decisions and only occasional changes in the work setting; work at a consistent pace for two-hour increments throughout the workday, but not a production rate pace where each task must be completed within a strict time deadline; and have occasional face-to-face interaction with the

mail, operating a folding machine, and sorting agricultural produce, and that tens of thousands of such jobs were available nationally. R. 59.

The third hypothetical described a person with the same limitations, who could perform sedentary work. R. 60. VE Byers opined that person could perform work as a document preparer and sedentary assembler, and that tens of thousands of such jobs were available nationally. *Id.*

Lastly, in response to the fourth hypothetical and the ALJ's questioning, VE Byers opined that no jobs would be available for a hypothetical person who would be off task or absent for certain periods.[9]

## C. *Relevant Medical Record*

In his motion for summary judgment, plaintiff argues that the ALJ erred in: (1) failing to acknowledge and elicit testimony to resolve an apparent conflict between the VE's testimony and the Dictionary of Occupational Titles ("DOT"); and (2) failing to develop a full and fair record to support the finding that plaintiff's remaining limitations, if abstinence were sustained, would not be disabling. *See* Pl's Br. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 5–14, ECF No. 14. Although plaintiff's PTSD and other mental health issues apparently date back to 2008, this review

---

general public, coworkers and supervisors while performing work tasks. R. 58–59.

The second hypothetical person was additionally limited to no face-to-face interaction with the general public, and no tandem tasks. R. 59–60.

[9]The fourth hypothetical person needed to take breaks throughout the workday due to symptom flare-ups, was off task more than 15% of the workday and absent more than one day per month, was distracted by physiologically-based symptoms, and could not work a full week without becoming insubordinate or argumentative. R. 60.

When the ALJ asked how much time off task and how many absences were permitted by employers, VE Byers testified that a person could not be off task 10 percent of the work day or absent more than one day per month. *Id.*

primarily examines treatment plaintiff received on or after January 2018, approximately eleven months prior to plaintiff's alleged onset date of December 1, 2018.

### 1.   *Treatment plaintiff received while serving in the U.S. Navy prior to the alleged onset date*

#### a.   **Treatment plaintiff received with respect to his mental health prior to his alleged onset date**

Plaintiff treated with Rebecca L. McCullar, a therapist with the outpatient psychiatry clinic at the Naval Medical Center Portsmouth, on January 23, 2018, for reccurring PTSD symptoms that had been increasing the previous four months. R. 568, 570. He reported "getting more angry and increasingly negative and reckless at home and work," and having "outbursts." R. 568. Ms. McCullar noted that plaintiff's PTSD symptoms "had previously been brought somewhat under control with another therapist,"[10] and plaintiff was currently taking Zoloft. R. 568–69.

Ms. McCullar noted plaintiff was at moderate risk of suicide, quoting plaintiff's statement that, "I would describe any suicidal ideation to be more of a destructive behavior issue." R. 570. Plaintiff's mental status examination was normal,[11] and his prognosis was "[g]ood." *Id.* Plaintiff's treatment plan included medication management and individual cognitive behavioral therapy. R. 573.

In June 2018, Ruth E. Smith, M.D., called security due to plaintiff yelling at an employee

---

[10] There is a notation under "psychiatric history" that plaintiff had seen another therapist in 2017 for "PTSD mild chronic." R. 569.

[11] Notations for plaintiff's mental status and behavioral observations indicate he was neatly groomed, fully oriented, cooperative, used appropriate eye contact and behavior, had full range of affect, good immediate and remote memory, clear thought process, normal speech, no evidence of psychosis (hallucinations, delusions, or bizarre thinking), average intelligence, intact judgment and impulse control, good insight, and no suicidal or homicidal ideation. R. 397, 477, 512, 543, 570.

in medical records. R. 518. Dr. Smith treated plaintiff for headaches the following week, noting that his PTSD symptoms were "not optimally controlled," and "[e]xogenous testosterone [is] possibly contributing to outbursts." R. 523. Dr. Smith increased plaintiff's Zoloft and added Atarax to be used rarely and as needed. *Id.*

Plaintiff returned for therapy with Ms. McCullar on April 10, July 6, August 24, and October 12, 2018. R. 394, 474, 509, 540. During each session, plaintiff had a normal mental status examination with the same notations made during the January 2018 visit, and he received a "[g]ood" prognosis. R. 397, 477, 512, 543.

On April 10, 2018, plaintiff described having flashbacks about the death of his co-sailor leading to anxiety and isolation from others. R. 540. Ms. McCullar found plaintiff's "Acute Risk [for] Suicide" to be intermediate. R. 544.

On July 6, 2018, plaintiff was tearful and worried about disclosing anything that would affect his career, but was willing to try cognitive processing therapy in hopes of not feeling depressed and anxious. R. 509–10. Ms. McCullar listed plaintiff's traumas as the death of his son at age one-month, his friend being decapitated on the carrier, and a friend losing their leg due to being run over by an airplane wheel. R. 509. Plaintiff described feeling chronically suicidal and needing his wife to drive him to work due to his impulsivity. *Id.* Ms. McCullar found plaintiff was a "High Acute Risk for Suicide," but not a risk of harm to others. R. 513; *see also* R. 514 (noting "[p]atient was feeling suicidal before coming to session and was able to talk and get out some emotions he needed to in order to feel better and not suicidal").[12] Plaintiff's "Acute Risk for

---

[12] On July 23, 2018, when seen by Dr. Smith for a medication refill, plaintiff reported sleeping much better, that his anxiety was much improved with Zoloft, his emotions were improving, and his wife had "really noticed a difference." R. 502.

Suicide" remained "High" during his August 24 and October 12, 2018 visits. R. 398, 478.

On August 24, 2018, plaintiff reported feeling "[v]ery [g]ood" and "was cheerful . . . despite feeling some deep depression." R. 474. He indicated that he did not want to die but that he "thinks about destructive things such as jumping out of a moving car." *Id.* Plaintiff was able to relax during the appointment and laugh with the therapist, but "admitted to isolating in his room when he comes home from work." R. 474–75. Plaintiff was encouraged to discuss Zoloft with his doctor due to his continued suicidal ideation. R. 480.[13]

On October 12, 2018, plaintiff reported to Ms. McCullar, that he was doing "much better" since his previous appointment, that "things were going great and he had been getting out more and exercising." R. 394. Ms. McCullar noted the plaintiff "was cheerful today and positive about his future." *Id.* He reported he was "Not using alcohol." R. 395.

### b.   Treatment plaintiff received with respect to his physical health prior to his alleged onset date

Plaintiff was treated for various physical issues during 2018. In January 2018, plaintiff was given a "light duty chit" that allowed him to avoid the high impact calisthenics required by his command during physical training due to bilateral knee pain with high impact activities. R. 575–76.

In March 2018, plaintiff was seen for hearing loss in his right ear, testicular hypofunction, bilateral ankle pain (with a notation that the ankle exam was "unremarkable"), and elevated blood pressure. R. 553, 560, 564.

---

[13] On August 29, 2018, during a follow up appointment with Dr. Smith, plaintiff reported that, with respect to PTSD, he was having "a couple tough weeks" with a flare up the previous week, but that he was "doing better," and did not want to change his medications (Zoloft and Prazosin). R. 466, 469.

In June 2018, plaintiff was seen for testicular hypofunction, headaches, and high blood pressure. R. 518, 523–24, 536. On June 22, 2018, plaintiff met the "preliminary diagnostic criteria [for fibromyalgia that is] complicated by ongoing uncontrolled PTSD, hypogonadism." R. 523. Dr. Smith increased plaintiff's Zoloft prescription and started Gabapentin for pain. *Id.*

On July 18, 2018, plaintiff was treated for numbness in both forearms down to his finger tips and loss of grip strength in both hands. R. 493. Plaintiff reported having the symptoms for five years, but that they were progressing. R. 494. An examination of plaintiff's hands and fingers was normal aside from some tenderness in the fingers of the right hand, pain with movement of the right ring finger, and reduced sensation of the third, fourth, and fifth fingers of both hands. R. 495. An examination of his wrist revealed numbness/tingling in the median nerve distribution for both wrists, but normal stability, negative Tinel's sign, normal motion, and no neurological weakness. *Id.* Plaintiff's cervical spine motion was decreased, but gait, stance, and balance were normal. *Id.*

On July 23, 2018, plaintiff reported sleeping much better, and that his muscle, joint, and nerve pain had all improved with Gabapentin, though the effect had been waning slightly. R. 502. Dr. Smith increased plaintiff's Gabapentin, refilled meloxicam and started amlodipine for hypertension. R. 504.

On August 29, 2018, plaintiff reported to Dr. Smith that he had moderate pain (4 out of 10), and that "Gabapentin continues to work great" for his fibromyalgia. R. 466.

On October 15, 2018, VA notes indicate plaintiff was "NOT currently on a profile/limited duty chit," and "IS deployable." R. 403. Plaintiff "drinks alcohol 2–3 days weekly, having 4–5 beers per sitting." R. 407. Plaintiff's blood pressure was elevated, and he reported not taking his

medication the previous week. R. 450.

On October 16, 2018, plaintiff had his final physical prior to retirement from the U.S. Navy. R. 391–92. Notations indicate plaintiff was complying with his medication regimen and that he was pain free. R. 391.

### 2.   *VA disability determination*

In November and December 2018, plaintiff was examined by doctors with the VA in connection with plaintiff's military discharge and his VA rating decision. R. 162, 812–943.[14] Plaintiff was diagnosed with plantar fasciitis, hypertension, migraines, pneumothorax requiring chest tube placement and post-procedural scar, gastroesophageal reflux disease (GERD), cervical paraspinal tendonitis with decreased lordosis, Meniere's syndrome, hearing loss, ulnar nerve sensory neuropathy, fracture of right elbow with scarring and neuropathy, and degenerative arthritis in his knees, feet, spine, and right elbow. R. 813, 825, 834, 837, 846, 882, 891, 903, 908, 916, 928, 945.

On December 5, 2018, Melody Sibilia, Ph.D., with the VA, completed a questionnaire regarding plaintiff's PTSD. R. 933–43. Plaintiff reported multiple PTSD symptoms, including nightmares, flashbacks, irritability, angry outbursts, estrangement, problems with concentration, and sleep disturbance. R. 935. Plaintiff reported that he began using mental health services in 2015, consisting of counseling and medication management, and reported taking Zoloft and Prasozin. R. 938. Plaintiff reported to Dr. Sibilia that he had been drinking twelve beers a day

---

[14] General practitioner Eric Merrill, M.D, performed examinations of plaintiff's knees, ankles, feet, hips, thighs, back, elbow, forearm, throat, neck, and respiratory system, as well as assessments of his general medical condition and headaches. R. 812–914. John Lyle, M.D., performed examinations of plaintiff's ears and peripheral nerves, and Melody Sibilia, Ph.D., performed the PTSD examination. R. 915–43.

12

"for a while . . . to take 'his crazy thoughts out of his head.'" *Id.* Plaintiff reported continuing to use alcohol "despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of alcohol." R. 935. Dr. Sibilia noted plaintiff attended the appointment with his wife, was dressed appropriately, and was fully oriented in all spheres. R. 942. Plaintiff presented circumstantial speech and was irritable and anxious but cooperative during the examination. *Id.* He denied any current suicidal or homicidal ideation, though he explained that "he gets [suicidal ideation] without a plan very often." *Id.* Dr. Sibilia diagnosed plaintiff with PTSD with panic attacks, and severe alcohol use disorder. R. 933.

The VA rating decision, issued January 12, 2019, awarded plaintiff a 100% service-connected disability for PTSD "with panic attacks to include alcohol use disorder and [TBI] (also claimed as concussion with loss of consciousness, amnesia, insomnia, major depressive disorder recurrent, Meniere's disease and combat and operational stress)." R. 159.[15]

### 3. *Treatment plaintiff received after his alleged onset date of December 1, 2018, and following his discharge from the U.S. Navy*

#### a. Treatment plaintiff received with respect to his mental health after his alleged onset date

On March 12, 2019, plaintiff had a mental health consult with psychology intern Sheila O'Brien, who worked under the supervision of John A. Mason, Psy.D., a staff psychologist with the VA. R. 751–59. Plaintiff reported that his anxiety and depression symptoms began "sometime

---

[15] Plaintiff was also awarded the following service-connected disabilities: sleep apnea (50%), right elbow fracture and degenerative arthritis (50%), fibromyalgia (40%), right elbow pronation (30%), urinary frequency (20%), degenerative arthritis of the spine (20%), plantar faciitis (10%), cervical paraspinal tendonitis with decreased lordosis (10%), GERD (10%), left chronic ankle sprain (10%), degenerative arthritis of the left knee (10%), right chronic ankle sprain (10%), degenerative arthritis of the right knee (10%), and tinnitus (10%). R. 159–61.

in 2008," when he witnessed his friend's decapitation. R. 751–52. Plaintiff witnessed another incident in 2014 where a "tire roll[ed] over a guy's leg," and plaintiff had to act as a first responder. R. 753.[16] Plaintiff described distressing nightmares, visual hallucinations, panic attacks, "uncontrollable" anger triggered by "little[] things" like cabinets slamming, daily anxiety, and a depressed mood. R. 752–54. He explained that monthly individual therapy, beginning in 2016 at the Naval Medical Center, "didn't help" because the appointments were "too spread out." R. 755.

Plaintiff shared that, after experiencing the 2008 trauma, he started drinking alcohol "all the time," and would "drink alcohol just to be able to sleep." R. 754–55. Since retirement, plaintiff reported typically drinking 12 beers and "some liquor" daily to help with anxiety and sleep. R. 755.[17] Plaintiff also indicated "life has gotten worse" since he retired from the Navy, and he avoids people and going places due to anxiety, irritability, and potential confrontation. R. 754.

Ms. O'Brien noted plaintiff was appropriately dressed with good grooming and hygiene, was engaged with a high level of cooperation, was moderately anxious at the beginning of the evaluation (shifting in his chair and shaking his leg) gradually becoming more relaxed, and reported his mood as "[n]ot too bad today." R. 757. His insight and judgment "[a]ppeared sound," and his concentration "[a]ppeared fair" during the evaluation. *Id.*

---

[16] Plaintiff further reported chronic pain in his feet and back "all the time" since 2007, as well as lower back pain from a broken tailbone and "bad neck pain" due to fractures of the vertebrae for "many years." R. 754.

[17] On April 11, 2019, Claribel Lopez, MSN, RN, performed an alcohol screening test. R. 790–91. Plaintiff indicated he drank alcohol four or more times a week, drinking ten or more alcoholic drinks on a typical day. R. 791.

Ms. O'Brien listed plaintiff's symptoms[18] and diagnosed plaintiff with PTSD by history with panic attacks, severe alcohol disorder, and persistent depressive disorder with late onset, mood-congruent psychotic features and severe, persistent major depressive episode. R. 758. She recommended plaintiff for the PTSD treatment clinic and the pain clinic, and Dr. Mason concurred with Ms. O'Brien's clinical impressions and plan. R. 758–59.

On April 22, 2019, plaintiff began attending individual psychotherapy sessions with psychology intern Charity Seitz, who was working under the supervision of Dr. Mason. R. 782–84. Plaintiff reported that nightmares, flashbacks, irritability, and depressed mood were his biggest concerns. R. 784. Ms. Seitz diagnosed plaintiff with delayed onset PTSD and persistent depressive disorder. R. 783. Plaintiff attended nine individual cognitive processing therapy sessions with Ms. Seitz, with his last session on August 2, 2019. R. 780–84, 1045–47, 1055–65, 1074–83, 1092–94.

During these sessions, Ms. Seitz often made the following behavioral observations: plaintiff appeared alert and fully oriented; was appropriately dressed with evidence of adequate grooming and hygiene; used appropriate eye contact and normal speech; had fair insight and judgment; "relatively intact" attention, concentration, and memory; adequate receptive and expressive language skills; organized and goal-directed thought processes; no perceptual distortions or paranoid, delusional, or otherwise unusual thought content; and, no homicidal

---

[18] Plaintiff's symptoms included distressing memories of the trauma, nightmares, flashbacks, intense psychological distress, physiological reactions to reminders of the traumatic event (like car accidents, blood, graphic movies or news), persistent negative beliefs about self and others, a persistent negative emotional state, diminished interest in pleasurable activities, estrangement, inability to experience positive emotions, irritability, hypervigilance, insomnia, and problems with concentration. R. 753.

ideation, plan, or intent.  *See* R. 781, 783, 1046, 1057, 1060, 1076, 1079, 1094.[19]  Ms. Seitz considered plaintiff to be a low risk for suicidal behavior.  R. 780, 784, 1046, 1057, 1060, 1063, 1076, 1079, 1094.

On April 26, 2019, plaintiff described his mood as "OK."  R. 781.  Plaintiff reported suicidal thoughts, and feeling like a burden to his family, but indicated no plan or intent to act on thoughts.  R. 782.  He also reported guilt that his friend was killed when taking his place on the ship deck, stating he "knew what signs to look for, like when to know someone was sleepy," but did not tell his friend to return to bed.  *Id.*  Following plaintiff's disclosure that he drinks 8 to 12 beers "almost daily," Ms. Seitz advised that "trauma-focused therapy while using substances is not advised."  R. 781.

On May 14, 2019, plaintiff described his mood as "[a]lright."  R. 1094.  The session ended early because plaintiff was exhausted and "had a difficult time focusing."  *Id.*  Plaintiff indicated his depressed mood impacted his ability to function lately, and caused passive suicidal thoughts, though he had no intent or plan to harm himself.  *Id.*  Plaintiff indicated he cut alcohol consumption in half—from 12 beers to 6 beers daily.  *Id.*

On May 23, 2019, plaintiff described his mood as "Good," indicating he was "in a 'much better mood' this week."  R. 1079–80.  Plaintiff also described his mood as "good" in four of his subsequent five sessions.[20]  R. 1046, 1057, 1064, 1076.  Further, plaintiff reported no suicidal

---

[19] Ms. Seitz described plaintiff's affect as:  slightly anxious (R. 781, 1046), somber (R. 1094), full range and anxious (R. 1060), full range (R. 1057, 1064), congruent but tearful (R. 1079), and congruent (R. 1076).

[20] On June 24, 2019, over the telephone, plaintiff informed Ms. Seitz that his mood was "great," and that, "[t]his may sound weird and all, but the stuff you told me is really changing my life!" R. 1072.

ideation on May 23 or in any subsequent sessions. R. 1057, 1060, 1064, 1076, 1080, 1094.

On May 31, 2019, the session focused on plaintiff's feeling that he was a burden on his family. R. 1076–77. On June 28, 2019, plaintiff appeared anxious when reading his trauma account aloud, but indicated he had learned "a lot" from the writing exercise. R. 1064.

On July 5, 2019, plaintiff described his mood as "[n]ot too good," he was experiencing anxiety (leg shaking), and his insight and judgment were poor. R. 1060. Plaintiff indicated therapy has "really helped me," and "I even thought about quitting drinking for good." R. 1061. Plaintiff reported decreasing his alcohol consumption "by over half" indicating "he does not drink daily." *Id.*

On July 12, 2019, plaintiff reported "only one night of drinking," during which he drank 3–4 beers. R. 1057. He indicated his drinking had decreased from daily to one time each week, and he "reported the benefits from not drinking." *Id.*

On August 2, 2019, plaintiff had his last individual therapy session with Ms. Seitz. R. 1045–47. He reported feeling less guilty about his friend's death, and limiting his drinking to two beers 1–2 times each week. R. 1046. He reported no "anger outbursts" in the past several weeks, which was described as "another milestone of progress." *Id.*[21]

In August 2019, the VA found plaintiff was not eligible for the caregiver program, as he was independent in his activities of daily living and his current caregiver worked full time. R. 1032. The eligibility team found that, while plaintiff was "symptomatic with his PTSD," he was under treatment, making progress towards his goals, and reporting no suicidal ideation, homicidal ideation, hallucinations, or delusions. *Id.*

---

[21] Plaintiff "reported his back was hurting[,] and he was hunched over." R. 1046.

From May through September 2019, nurse practitioner Major-Cooper with the PTSD clinical team met with plaintiff and monitored his medications. R. 1021–28, 1038–45, 1065–72, 1083–88. On May 23, 2019, plaintiff reported he slept sporadically, but his nightmares "ha[d] decreased[] some." R. 1086. While the majority of his mental status exam was normal,[22] his mood was noted as depressed, irritable, and anxious. R. 1087. Plaintiff reported no side effects from his medications (Prazosin for nightmares, Buspirone for anxiety, and Trazodone for insomnia). R. 996, 1084–87.

On June 26, 2019, plaintiff stated therapy was beginning to help and his insomnia was resolving. R. 1070. Plaintiff reported drinking 3–4 beers 3–4 days each week. *Id.* Plaintiff had a "slightly flat" affect, but his mental status examination was otherwise normal.[23] *Id.* Plaintiff reported that his medications were helping and did not cause side effects. *Id.*

On August 7, 2019, plaintiff indicated that his fear of nightmares "continues to improve, some." R. 1043. He reported his medications (Prazosin, Buspirone, Trazodone, Gabapentin for mood and pain, and Sertraline for mood, anxiety, and PTSD) "are definitely working," and reported no side effects from the medications. R. 996–97, 1043. His mental status examination was otherwise normal, with similar findings as in June 2019. *Compare* R. 1044, *with* R. 1070.

On September 11, 2019, plaintiff reported his "son almost died [when he was] exposed to bad drugs." R. 1026. Plaintiff indicated he would attend the peer support group, but was very

---

[22] Plaintiff was casually dressed and cooperative, had intact insight and judgment, expressed no suicidal or homicidal ideation, and showed no evidence of psychotic symptoms. R. 1087.

[23] Plaintiff was neatly dressed, had good eye contact, was interactive, able to verbalize feelings, used normal speech, had fair attention and concentration, had logical and goal directed thoughts, no delusions or hallucinations, and a euthymic mood. R. 1070.

interested in resuming individual therapy. R. 1027. He reported his new medications were helping and he had no side effects from his medications (Buspirone, Gabapentin, Prazosin, Sertraline, and Trazodone). R. 1026–27. His Buspirone dosage was increased to 10 mg twice a day. R. 1027–28.

### b.     Treatment plaintiff received with respect to his physical health after his alleged onset date

On May 3, 2019, plaintiff had his initial visit with primary care physician Mehul Trivedi, M.D., with the VA. R. 1097–101. Plaintiff reported that his main concern was to obtain his sleep study results and CPAP equipment. R. 1096. Plaintiff indicated that he was taking some time off, had gained a few pounds, had lost his license due to alcohol consumption, and "drinks 12 beers a night." R. 1098. Plaintiff reported that he "stays active, cuts grass, e[a]ts well, [and] sleeps well [with a] CPAP [machine]." *Id.* Dr. Trivedi noted normal findings on physical examination including an indication that plaintiff's pain level was "0." R. 1099–100. Plaintiff was counseled regarding diet, weight loss, exercise, and alcohol cessation. R. 1100–01.

On August 8, 2019, plaintiff requested a refill of his medications from Claudia E. Gonzalez, M.D., with the Naval Medical Center in Portsmouth. R. 970–72. Dr. Gonzalez noted that plaintiff was taking Topomax twice daily and Meloxicam as needed for migraines, which had decreased from 3–4 times each week to 1–2 times each week. R. 970. Plaintiff indicated his pain was a 3 out of 10, and he had not been taking his blood pressure medication as prescribed. *Id.* Plaintiff's physical examination was normal. R. 970–71.

Following routine labwork in August 2019, plaintiff was notified that there was "no concern" for his kidneys and his lipids "looked good," but his "[l]iver numbers [were] slightly higher than expected." R. 968. Dr. Gonzalez indicated this might be due to fasting for too long,

and requested that plaintiff repeat the testing. *Id.*; *see* R. 1008 (noting an abdominal ultrasound was ordered to assess the health of plaintiff's liver).

On September 23, 2019, plaintiff presented to the VA with concerns about his Vitamin D levels, and was encouraged to take prescription strength Vitamin D once a week for six months. R. 1014–15.

### 4.    *Opinions of State Agency Physicians*

On March 27, 2019, on initial review, state agency physician William Rutherford, Jr., M.D., opined plaintiff's limitations are "not severe enough to keep [him] from working." R. 101. Dr. Rutherford found plaintiff was capable of medium work limited to lifting and carrying 50 pounds occasionally and 25 pounds frequently, standing or walking for six hours in an eight-hour workday, and sitting for six hours in an eight-hour workday. R. 96, 100. Dr. Rutherford found plaintiff could occasionally climb ladders, ropes, and scaffolds; frequently climb ramps and stairs, stoop, kneel, crouch and crawl; and was unlimited in his ability to balance. R. 96–97. Dr. Rutherford noted that, while substance abuse was documented, a material determination was not required. R. 100. On reconsideration, Catherine Howard, M.D., reached the same conclusions. R. 112–13, 115–17.

On initial review, state agency psychologist Stephen P. Saxby, Ph.D., rated plaintiff's: (1) understanding and memory as unlimited; (2) concentration and persistence ranging from not significantly to moderately limited; (3) social interactions as ranging from not significantly to moderately limited; and (4) ability to adapt as not significantly to moderately limited. R. 97–99. On reconsideration, state agency psychologist Jo McClain, Psy.D., reached the same conclusions. R. 113–15.

### 5.    *Medical Source Statements*

On June 30, 2019, VA staff psychologist, Dr. John Mason, filled out a one-page, check-the-box form titled psychological source statement. R. 953. Dr. Mason diagnosed plaintiff with chronic PTSD, and indicated he had every symptom listed on the form. *Id.*[24] Dr. Mason opined that plaintiff was mildly impaired in his ability to carry out short, simple instructions; markedly impaired in his ability to maintain concentration and focus, get along with co-workers, and perform at a consistent pace; and extremely impaired in his ability to get along with the general public or supervisors, respond to changes in routine, and deal with normal work stress. *Id.* Lastly, Dr. Mason indicated plaintiff would be absent from work due to his mental health problems more than four days per month. *Id.*

On July 11, 2019, Claudia E. Gonzalez, M.D., with the Naval Medical Center Portsmouth, completed two check-the-box medical source statements for plaintiff, one for fibromyalgia and one for chronic pain. R. 954–56. Dr. Gonzalez found plaintiff's fibromyalgia caused multiple symptoms, including cognitive pain and migraines twice each week. R. 954. Dr. Gonzalez indicated plaintiff's impairments caused marked limitations in his ability to sustain concentration, persistence, and pace, and extreme limitations in his activities of daily living. *Id.*

With respect to plaintiff's chronic pain, Dr. Gonzalez indicated plaintiff required orthopedic inserts and ankle braces to ambulate, but would not need to elevate his legs during the

---

[24] The following symptoms were checked: anhedonia, appetite disturbance, sleep disturbance, feelings of guilt or worthlessness, disturbed mood, mood swings, decreased energy, malaise, difficulty with focus and concentration, memory loss, personality change, isolation or emotional withdrawal, persistent anxiety, anxiety attacks, pressured speech, flight of ideas, racing thoughts, autonomic hyperactivity, disorientation to time or place, delusional thinking, paranoid thinking, impairment or impulse control, and blunt, flat, or inappropriate affect. R. 953. Dr. Mason also checked the box for "other," writing in visual hallucinations. *Id.*

workday. R. 956. As a result of both fibromyalgia and chronic pain, Dr. Gonzalez opined that plaintiff was limited to lifting and carrying ten pounds occasionally, and twenty pounds rarely. R. 954, 956. Plaintiff could stand and walk or sit for less than two hours in an eight-hour workday without accommodations, and would be absent from work more than four days per month as a result of his impairments. R. 955–56.

### III.    THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[25] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. § 404.1520(a). Specifically, the ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents performance of any past relevant work in light of his residual functional capacity; and (5) had an impairment that prevents engaging in any substantial gainful employment. R. 17–28.

In 1996, the Contract with America Advancement Act amended the Social Security Act to preclude a finding of disability "if alcoholism or drug addiction is a material contributing factor to the disability finding." *Delk v. Colvin*, 675 F. App'x 281, 283 (4th Cir. 2017) (citation omitted); 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled for purposes of

---

[25] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *accord* 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a).

this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing

factor material to the Commissioner's determination that the individual is disabled.").   The

regulations that implement this provision "specify that alcoholism or drug addiction is a [material]

contributing factor . . . if an individual would not be disabled if he stopped using alcohol or drugs."

*Mitchell v. Comm'r of the Soc. Sec. Admin.*, 182 F.3d 272, 274 n.2 (4th Cir. 1999) (citing 20 C.F.R.

§§ 404.1533(b), 416.935(b)).   Accordingly, when an ALJ finds a plaintiff disabled and also finds

evidence of substance abuse, she must determine whether the disability would exist in the absence

of the substance abuse.   *Delk*, 675 F. App'x at 283 (citation omitted).     If a plaintiff would no

longer be disabled in the absence of alcohol or drug use, then substance use constitutes a material

contributing factor that precludes a finding of disability.   *Id.*

Social Security Ruling 13-2p provides guidance for determining materiality.   2013 WL

621536 (Feb. 20, 2013).   First, the plaintiff bears the burden of proving his disability in the absence

of alcohol or drug use.   *Id.* at *4 ("When we apply the steps of the sequential evaluation a second

time to determine whether the claimant would be disabled if he or she were not using drugs or

alcohol, it is our longstanding policy that the claimant continues to have the burden of proving

disability throughout the . . . materiality analysis.").[26]   To support a finding that plaintiff's

substance use is material, there must be "evidence in the case record that establishes that a claimant

with a co-occurring mental disorder(s) would not be disabled in the absence of [substance use]."

*Id.* at *9.[27]   SSR 13-2p provides that, "[w]e will find that [substance use] is not material . . . if the

---

[26] The ruling clarifies that, "[t]here does not have to be evidence from a period of abstinence for the claimant to meet his or her burden of proving disability." 2013 WL 621536, at *4.

[27] SSR 13-2p explains that, "[w]e do not know of any research data that we can use to predict reliably that any given claimant's co-occurring mental disorder would improve, or the extent to

record is fully developed and the evidence does not establish that the claimant's co-occurring mental disorder(s) would improve to the point of nondisability in the absence of [substance use]." *Id.*

With respect to plaintiff, the ALJ first determined that he met the insured requirements[28] of the Social Security Act through December 31, 2023, and had not engaged in substantial gainful activity since December 1, 2018. R. 17.

At steps two and three, the ALJ found that plaintiff's PTSD, alcohol use disorder, anxiety, traumatic brain injury, obstructive sleep apnea, bilateral carpal tunnel syndrome, degenerative disc disease of the thoracolumbar and cervical spine, right elbow disorder, plantar fasciitis, and osteoarthritis of the feet constituted severe impairments. R. 17–18. The ALJ determined that plaintiff's severe impairments, including his substance use disorder, meet section 12.15 of the Listings (trauma and stress-related disorders), 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 19–20. Specifically, the ALJ found plaintiff met Listing 12.15 because his PTSD, in conjunction with his substance abuse, result in marked limitation in his ability to concentrate and in his ability to adapt or manage himself. *Id.*

Next, the ALJ determined that, if plaintiff "stopped the substance use," he would continue to have severe impairments, but the remaining impairments, either singly or in combination, failed

---

which it would improve, if the claimant were to stop using drugs or alcohol." 2013 WL 621536, at *9. As a result, "[u]nlike cases involving physical impairments, we do not permit adjudicators to rely exclusively on medical expertise and the nature of a claimant's mental disorder," to find materiality when a claimant has a co-occurring mental disorder. *Id.*

[28] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt.

P, App. 1. R. 20–22. The ALJ found that, if plaintiff stopped substance use, he would not satisfy

the paragraph B criteria as he would have only moderate limitations in his ability to adapt or

manage himself, and in his ability to concentrate, persist, and maintain pace.[29] R. 21–22.

The ALJ next found that, if plaintiff stopped the substance use, plaintiff possessed the

residual functional capacity ("RFC") to perform a limited range of light work:

> The [plaintiff] is limited to stand[ing] and walk[ing] 4 hours and sit[ting] 4 hours
> in an 8 hour workday. He can occasionally operate foot controls. The [plaintiff]
> can frequently handle and finger. He cannot climb ladders, ropes and scaffolds.
> The [plaintiff] can frequently perform all other postural activities. He cannot work
> around heights or hazards. The [plaintiff] can understand, remember, and carry out
> simple instructions. He can work in a low stress job, defined as one that requires
> only occasional work-related decisions and involves only occasional changes in the
> work-setting. The [plaintiff] can work at a consistent pace for two hour increments
> throughout the work day, but not at a production rate pace where each task must be
> completed within a strict time deadline. He can have very little interaction with
> others while performing work tasks. The [plaintiff] is prohibited from having face
> to face interaction with the general public.

R. 22.

Although finding that, if he stopped substance use, plaintiff's impairments could be

reasonably expected to cause his symptoms, the ALJ found his statements about their intensity,

persistence, and limiting effects were not credible. R. 23. Specifically, the ALJ found the degree

---

[29] The ALJ's decision contains an inconsistency with respect to plaintiff's marked limitations.
R. 19–20. The ALJ initially found plaintiff's mental impairments, including substance use
disorder, cause marked limitations in *interacting with others* and adapting or managing oneself.
R. 19. After addressing the evidence, the ALJ concluded plaintiff's PTSD, in conjunction with his
alcohol abuse, result in marked limitations in his *ability to concentrate* and adapting and managing
oneself. R. 20. The inconsistency is a harmless error, as the ALJ ultimately concluded that, if the
plaintiff stopped the substance use, he would have moderate limitations in interacting with others;
concentrating, persisting, or maintaining pace; and adapting and managing oneself. R. 21.

of limitation alleged was not supported when alcohol abuse was absent. R. 24–25 (noting mental health symptoms improved with decreased alcohol intake).

The ALJ found the State agency medical experts' opinions that plaintiff could perform a limited range of medium exertional work were not supported or persuasive. R. 25.

At step four, the ALJ found that plaintiff's existing RFC precluded his return to past relevant work even if he stopped substance use. R. 27. Based in part upon the VE's testimony, however, the ALJ found that other jobs existed in significant numbers nationally that plaintiff could perform if he stopped substance use. R. 27–28.

Accordingly, the ALJ concluded plaintiff's substance use is a contributing factor material to the determination of disability because plaintiff would not have been disabled from the alleged onset date through the date of the opinion if he stopped substance use. R. 28. Therefore, plaintiff was ineligible for a period of disability or DIB. *Id.*

## IV.   **STANDARD OF REVIEW**

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589 (citing *Hays*, 907 F.2d at 1456). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman*, 829 F.2d at 517.

## V.   ANALYSIS

***A.   There is no apparent conflict between the Dictionary of Occupational Titles and the VE's testimony that a person with the ability to understand, remember, and carry out simple instructions can perform a reasoning level two job.***

At step four, the ALJ found that plaintiff could perform work as a folding machine operator. R. 27–28. Plaintiff asserts that there is an apparent conflict between the DOT's description of folding machine operator as requiring reasoning level two, and the VE's testimony that a hypothetical individual limited to "understand[ing], remember[ing], and carry[ing] out simple instructions" could perform the job. Pl.'s Mem. at 5–8; *see* R. 58–59 (VE's testimony). The

Commissioner argues there is no apparent conflict because "a limitation to simple instructions is compatible with level-two reasoning jobs." *See* Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") at 11–13, ECF No. 16.[30]

In *Pearson v. Colvin*, 810 F.3d 204 (4th Cir. 2015), the Fourth Circuit reviewed Social Security Ruling ("SSR") 00-4p, 65 Fed. Reg. 75760 (Dec. 4, 2000), 2000 WL 1898704, which addressed the methodology for assessing occupational information, including VE testimony, in disability claims. The Fourth Circuit ruled that SSR 00-4p requires an ALJ:  (1) to inquire of a VE whether the VE's testimony conflicts with job information contained in the DOT; (2) to also independently identify whether any apparent conflicts exist between the evidence supplied by the VE and the DOT; (3) to seek, with respect to any apparent conflicts identified, an explanation from the VE for any such conflict; and (4) to address whether the VE's "explanation is reasonable and provides a basis for relying on the [VE's] testimony rather than the [DOT]." *Pearson*, 810 F.3d at 208–11.

There was no apparent conflict between the VE's testimony and the DOT with respect to the folding machine operator job.  At the hearing, VE Byers indicated a hypothetical person with limitations, including the ability to "understand, remember and carry out simple instructions," could perform work as a folding machine operator, a reasoning level two job.  R. 58–60; *see*

---

[30] The ALJ also found at step four that plaintiff could perform work as a mail sorter. R. 27–28. Plaintiff and the Commissioner assert incorrectly that the job of mail sorter is a reasoning level two job. *See* Pl.'s Mem. 7; Def.'s Mem. at 11. "Mail sorter," an alternative title for a "mail clerk," is a reasoning Level 3 job. *Mail Clerk*, DOT 209.687-026 (4th ed., rev. 1991), 1991 WL 671813. As neither plaintiff nor the Commissioner briefed the issue as it applies to a reasoning Level 3 job, this report and recommendation will only address the job of folding machine operator. *See* 20 C.F.R. § 404.1566(b) ("Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications.").

*Folding-Machine Operator*, DOT 208.685-014 (4th ed, rev. 1991), 1991 WL 671754.  Appendix C of the DOT defines reasoning level two jobs as requiring the individual to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." *See Appendix C—Components of the Definition Trailer*, DOT, 1991 WL 688702.  At the conclusion of the VE's testimony, the ALJ asked whether there were any inconsistencies between her testimony and the DOT, and the ALJ did not indicate a conflict with regard to this issue.  R. 60–61.[31]

The Fourth Circuit has addressed whether certain limitations are incompatible with reasoning level two jobs.  In *Thomas v. Berryhill*, 916 F.3d 307, 313 (4th Cir. 2019), the Fourth Circuit held there is an "'apparent conflict' between a limitation to 'short, simple instructions' (as found in Thomas's RFC) and a need to carry out 'detailed but uninvolved . . . instructions' (as found in jobs requiring Level 2 reasoning)."  The Fourth Circuit clarified in *Lawrence v. Saul*, 941 F.3d 140, 143 (4th Cir. 2019), that the conflict in *Thomas* resulted from the restriction to "short" instructions, rather than the restriction to "simple" instructions, stating:

> "Short" is inconsistent with "detailed" because detail and length are highly correlated.  Generally, the longer the instructions, the more detail they can include.
>
> In contrast, the administrative law judge found that Lawrence could perform jobs limited to "simple, routine repetitive tasks of unskilled work."  There is no comparable inconsistency between Lawrence's residual functional capacity . . . and Level 2's notions of "detailed but uninvolved . . . instructions" and tasks with "a few [] variables."

---

[31] The VE responded that her answers to questions regarding being off-task, being absent, or negative workplace behavior were not covered in the DOT, but based on her training and experience as a vocational counselor.  R. 61.

> To begin with, detailed instructions are, in the main, less correlated with complexity than with length. Instructions often include many steps, each of which is straightforward. . . .   Further, there is no conflict between "simple" and "uninvolved" instructions, as both connote instructions that "are not complicated or intricate."

*Id.* at 143 (citations omitted).

Plaintiff argues the Fourth Circuit in *Lawrence* was distinguishing between "tasks" and "instructions," finding no apparent conflict between reasoning level two jobs and a restriction to short and simple "tasks," but an apparent conflict with short and simple "instructions." Pl.'s Mem. at 7–8. As a result, plaintiff asserts his limitation to "simple instructions" creates an apparent conflict with reasoning level two jobs requiring a remand. *Id.* at 8. The Court disagrees.

The *Lawrence* court focused the analysis on the difference between *short* and *simple*, not the difference between *tasks* and *instructions*, finding, "[e]ven assuming that 'tasks' and 'instructions' are synonymous, the key difference is that Thomas was limited to 'short' instructions." *Lawrence*, 941 F.3d at 143. The *Lawrence* court refrained from determining whether tasks and instructions were synonymous, because the appeal did not depend on its resolution. *Id.* at 143 n.7. This is because the court found limitations to both simple tasks and simple instructions to be compatible with reasoning level two jobs. *Id.* at 143–44. The court noted that "detailed instructions are . . . less correlated with complexity than with length," and "there is no conflict between 'simple' and 'uninvolved' instructions, as both connote instructions that are not complicated or intricate." *Id.* at 143 (quotations and citations omitted). It follows that limiting a plaintiff to simple instructions should not conflict with the reasoning level two requirement of "carry[ing] out detailed but uninvolved written or oral instructions." DOT, 1991 WL 688702.

Applying *Lawrence*, district courts in the Fourth Circuit have found RFCs limited to simple

*instructions* compatible with reasoning level two jobs. *See Dunivant v. Saul*, No. 1:19cv923, 2021 WL 620711, at *4 (M.D.N.C. Feb. 17, 2021) (holding "there is no conflict between Reasoning Level 2 and Plaintiff's ability 'to understand and remember simple instructions, make simple work-related decisions, and carry out simple instructions'"); *Gurley v. Saul*, No. 2:19cv869, 2020 WL 6218459, at *6–7 (D.S.C. June 24, 2020) (holding "[b]ecause Plaintiff was limited to 'simple,' rather than 'short,' instructions, there is no apparent unresolved conflict between the ALJ's RFC recommendation and the [reasoning level two] jobs identified by the vocational expert"), *report and recommendation adopted*, 2020 WL 5640531 (D.S.C. Sept. 21, 2020); *Turner v. Saul*, No. 5:19cv190, 2020 WL 3866669, at *9–10 (E.D.N.C. June 9, 2020) (finding "a hypothetical question limiting one to simple, oral instructions, simple, routine tasks, and simple, work-related decisions, is materially different from similarly restricting her to *short* tasks, instructions, or decisions[; a]nd, simple instructions, tasks, or decisions do not create an apparent conflict" with reasoning level two jobs), *memorandum and recommendation adopted*, 2020 WL 3840510 (E.D.N.C. July 8, 2020); *Aquino-Hernandez v. Saul*, No. 9:19cv582, 2020 WL 4678823, at *5 (D.S.C. Mar. 11, 2020) (holding "there is no apparent conflict between Plaintiff's RFC for simple instructions, and the Reasoning Level 2 job"), *report and recommendation adopted*, 2020 WL 2487554 (D.S.C. May 14, 2020).[32]

---

[32] Of the four district court cases cited in plaintiff's brief, two fail to support his argument that a limitation to simple instructions conflicts with reasoning level two jobs, and two were decided prior to the Fourth Circuit's *Lawrence* decision on October 24, 2019. Pl.'s Mem. at 7–8. The plaintiff in *Pruitt v. Saul* was limited to "simple, routine, repetitive tasks, with simple, *short* instructions." No. 5:19cv100, 2020 WL 6588367, at *3 (W.D.N.C. Nov. 9, 2020) (emphasis added). The court found the limitation to short and simple instructions fell between levels one and two creating a conflict with reasoning levels two and three jobs. *Id.* at *6. The plaintiff in *Massey v. Saul*, was limited to "simple, routine, repetitive tasks," which did not create a conflict with reasoning level two jobs. No. 1:18cv2702, 2019 WL 7605841, at *16–17 (D.S.C. Dec. 30, 2019),

As a result, there was no apparent conflict between VE Byers' testimony that a hypothetical person limited to "understand[ing], remember[ing], and carry[ing] out simple instructions" could perform work as a folding machine operator, and the DOT's classification of folding machine operator as a reasoning level two job. *See* R. 58–60, *Folding Machine Operator*, DOT 208.685-014. Plaintiff's motion for a remand to require the ALJ to acknowledge and resolve this apparent conflict should be **DENIED**.

**B.    *The ALJ's materiality determination***

Plaintiff asserts the ALJ's materiality determination—that plaintiff's alcohol use was a factor material to the finding of disability—is not based on a full and fair record and is not supported by substantial evidence in light of SSR 13-2p, requiring remand. Pl.'s Mem. at 8–14. The Commissioner asserts the ALJ's materiality finding was based on a full and fair record and is supported by substantial evidence. Def.'s Mem. at 13–20.

**1.    The ALJ did not err by failing to cite Social Security Regulation 13-2p.**

First, plaintiff asserts the ALJ's failure to cite to, or acknowledge, SSR 13-2p "is reversible legal error." Pl.'s Mem. at 12. The Commissioner argues it is "inconsequential" that the ALJ did not explicitly reference SSR 13-2p. Def.'s Mem. at 16. This is because she cited 20 C.F.R. § 404.1535, the regulation upon which SSR 13-2p is based, and followed both the regulation and SSR 13-2p in her decision. *Id.*

---

*report and recommendation adopted*, 2020 WL 301459 (D.S.C. Jan. 21, 2020). The two remaining cases were decided prior to *Lawrence* decision. *See Crystal Louise H. v. Comm'r, Soc. Sec. Admin.*, No. ADC-18-3922, 2019 WL 5309997, at *9 (D. Md. Oct. 12, 2019); *Kilpatrick v. Saul*, No. 1:18cv364, 2019 WL 4980003, at *4 (W.D.N.C. Oct. 8, 2019), *report and recommendation adopted*, 2020 WL 301459 (D.S.C. Jan. 21, 2020).

The ALJ's decision states:

> If it is found that the claimant is disabled and there is medical evidence of a substance use disorder, the undersigned must determine if the substance use disorder is a contributing factor material to the determination of disability. In making this determination, the undersigned must evaluate the extent to which the claimant's mental and physical limitations would remain if the claimant stopped the substance use. If the remaining limitations would not be disabling, the substance use disorder is a contributing factor material to the determination of disability (20 CFR 404.1535). If so, the claimant is not disabled.

R. 17.

The ALJ cited the appropriate regulation addressing the materiality determination, and walked through the steps required by the regulation.[33] The Court does not find the ALJ's failure to cite SSR 13-2p to be reversible legal error. Plaintiff cites no case in support of this argument. Further, plaintiff's argument that the ALJ failed to "abide by the Commissioner's policy" established in SSR 13-2p, is premised upon the remaining arguments in the memorandum, which will be addressed below. Pl.'s Mem. at 12.

### 2.     The ALJ adequately developed the record with respect to materiality.

Second, plaintiff asserts that where, as here, the record does not contain evidence of a period of abstinence, it is necessary to have a medical or psychological expert "review the file to help address the question of materiality." Pl.'s Mem. at 13. Otherwise, plaintiff asserts it is difficult "to render a meaningful comparative analysis for how he functions when sober versus when drinking." *Id.* The Commissioner counters that the applicable statute and regulations do not

---

[33] The ALJ determined plaintiff's mental impairments, including his substance use disorder, met Listing 12.15, but that plaintiff would not meet any listed impairment if he stopped the substance use. R. 19–22. The ALJ then determined plaintiff's RFC if he stopped substance use, finding he would not be capable of performing his past relevant work, but would be capable of performing other work in the national economy. R. 22–28. Accordingly, the ALJ held plaintiff's substance use disorder was a contributing factor material to the determination of disability. R. 28.

require the ALJ to base her materiality finding on medical opinion evidence, and the ALJ appropriately made a materiality finding based on "a period of drastically reduced alcohol consumption." Def.'s Mem. at 17–19.

Plaintiff's reliance on Social Security Ruling 13-2p for the proposition that, where there is no period of "sustained sobriety," the appropriate course is to "remand the case to have a medical or psychological expert review the file to help address the question of materiality" is misplaced. Pl.'s Mem. at 13.  The ALJ "*may* purchase a [consultative examination] if there is no existing medical evidence or the evidence as a whole, both medical and nonmedical, is insufficient" to determine materiality.  SSR 13-2p, 2013 WL 621536, at *11 (emphasis added); *see also* 20 C.F.R. § 404.1519a(b) (addressing situations where an ALJ may purchase a consultative examination). A consultative examination is not, however, required.  *See Delk*, 675 F. App'x at 284 (holding the ALJ was not obligated "as a general matter" to obtain the opinion of a consultative examiner on the issue of materiality).  Moreover, SSR 13-2p provides that "[t]he finding about materiality is an opinion on an issue reserved to the Commissioner . . . . [t]herefore, we will not ask a treating source, a [consultative examiner], a medical expert, or any other source for an opinion about whether [substance use] is material." 2013 WL 621536, at *8 n.19. The ruling explains that, "[w]e do not know of any research data that we can use to predict reliably that any given claimant's co-occurring mental disorder would improve, or the extent to which it would improve, if the claimant were to stop using drugs or alcohol." *Id.* at *9.  As a result, "[u]nlike cases involving physical impairments, we do not permit adjudicators to rely exclusively on medical expertise and the nature of a claimant's mental disorder" to find materiality when a claimant has a co-occurring mental

34

disorder. *Id.*[34] Instead, "we must have evidence in the case record that establishes that a claimant with a co-occurring mental disorder(s) would not be disabled in the absence of [substance use]." *Id.*

This Court has addressed a plaintiff's assertion that a consultative examination was necessary to fully develop the record, where "no medical evidence assesse[d] his abilities separately, to account for the effects of substance abuse." *Delk v. Colvin*, No. 2:14cv505, 2015 WL 13021474, at *10 (E.D. Va. Apr. 16, 2015). The ALJ in *Delk* relied upon records of hospital visits for physical ailments, documentation of psychiatric visits, and reports of state agency physicians to determine materiality. *Id.* This Court held "an additional consultative exam would serve no purpose and the ALJ was under no obligation to develop the record further" where there was "ample evidence explaining the reason for Delk's problems." *Id.* In affirming the district court decision, the Fourth Circuit held, "the ALJ was not obligated—either as a general matter or based on the facts of this case—to obtain the opinion of a consultative examiner regarding the interplay between his drinking and his disability." *Delk*, 675 F. App'x at 284.[35]

---

[34] In contrast, SSR 13-2p provides that, "[w]hen a claimant has a physical impairment(s) that is likely to improve with abstinence, we may consider medical opinions from treating or nontreating sources about the likely effects that abstinence from drugs or alcohol would have on the impairment(s)." 2013 WL 621536, at *8.

[35] The two cases cited by plaintiff to support the argument that a consultative examination is required to determine materiality when there is no period of sobriety are not persuasive. *See* Pl.'s Mem. 11–12. In *Hagan v. Colvin*, the parties consented to remand the case, and there are no facts or analysis to assist plaintiff's argument. No. 1:12cv339, 2013 WL 1798336, at *1 (W.D.N.C. Apr. 29, 2013). Further, the *Hagan* case was remanded with instructions that the ALJ *could* obtain evidence from a medical expert regarding materiality "if deemed necessary." *Id.* In *Thornhill v. Colvin*, the ALJ's finding that Thornhill's substance abuse was material to her disability was attributed to "an inference that Thornhill's mental status and overall functioning would improve if she were able to attain long-term sobriety," in the absence of opinion or testimonial evidence regarding the impact of plaintiff's substance abuse on her ability to work. No. 13-530, 2014 WL

In *Cage v. Commissioner of Social Security*, a case with several similarities to plaintiff's, the Second Circuit found substantial evidence to support the ALJ's materiality finding. 692 F.3d 118, 127 (2d Cir. 2012). Cage argued that "a predictive medical opinion is necessary in cases . . . in which 'it is not possible for an ALJ to separate the limitations imposed by substance abuse [and] by other non-[substance abuse] impairments.'" *Id.* at 126 (citing appellate brief). The ALJ found Cage met two mental health listings due to a "marked" limitation in social functioning and in concentration, persistence, or pace, but that these limitations would improve to "moderate" limitations in the absence of substance abuse. *Id.*

Cage's record contained no "extended periods of sobriety during the relevant period," but did contain "positive evaluations of Cage conducted during inpatient admissions when Cage did not have access to drugs or alcohol." *Id.* at 127. The ALJ also considered:

> (1) an addiction therapist's opinion that Cage's [substance use] "made worse" her medical and emotional issues; (2) Cage's admission that she had attempted suicide only when under the influence; (3) Cage's admission that her [substance use] was "not helpful" to her mental health; (4) that Cage had used crack cocaine the two times she reported hearing voices; and (5) that Cage told a treating physician that she was depressed because she had spent her money on cocaine.

*Id.* The Second Circuit found this to constitute substantial evidence that Cage's limitations with social functioning and with concentration, persistence, and pace, would improve from "marked" to "moderate" in the absence of drug and alcohol abuse. *Id.*

---

1328153, at *6–7 (W.D. Pa. Apr. 2, 2014) (quotations and citations omitted). The hearing conducted before the ALJ in *Thornhill* was "very brief," and did not address whether she refrained from using drugs or alcohol for a period of time. *Id.* at *7. The district court directed that, on remand, "Thornhill must be afforded an opportunity to be heard," and "the Commissioner must fully develop the record before rendering a ruling." *Id.* at *9 (quotations and citations omitted). Neither of these cases supports plaintiff's argument that his case should be remanded for a consultative examination.

Similarly, substantial evidence supports the ALJ's decision that plaintiff's mental health limitations would improve from "marked" to "moderate" if he abstained from alcohol. The ALJ considered the following evidence in making her materiality decision. Following his retirement from the Navy, and prior to May 2019, plaintiff indicated he regularly drank 12 alcoholic beverages a day. R. 19 (citing R. 789, 1098); *see also* R. 755. Plaintiff was diagnosed with a medically determinable alcohol abuse disorder in December 2018 and January 2019. R. 19 (citing R. 933). In December 2018, plaintiff reported that drinking worsened his mental health symptoms. *Id.* (citing R. 935). During this period, plaintiff "endorsed memories of trauma, flashbacks, avoidance of reminders, and persistent negative emotional state with insomnia." *Id.* (citing R. 740).

With respect to plaintiff's mental health following the start of individual therapy in May 2019, the ALJ considered the following. On May 14, 2019, plaintiff reported reducing his alcohol consumption by half. R. 25 (citing R. 1094). The ALJ referenced plaintiff's mental status consultations from May through July 2019 with Ms. Seitz showing "mostly normal/intact status with a few mild to moderate findings of depression." *Id.* (citing R. 1060, 1064, 1076, 1094). The ALJ referenced plaintiff's reports to Ms. Major-Cooper during this period of no side effects from medications, that the medications were helping, and that his fear of nightmares had decreased. *Id.* (citing R. 1070, 1086). The ALJ noted plaintiff's reports to Ms. Seitz: in June 2019, that his mood was "great" and his medications were working; in July 2019, that therapy really helped him and he was considering quitting drinking for good; and, in August 2019, the he was not experiencing delusions and hallucinations and that he had no anger outbursts in the past several weeks, which was a considered a milestone in his progress. *Id.* (citing R. 1046, 1049, 1061, 1072). The ALJ

noted that plaintiff was denied caregiving services from the VA in August 2019, following a finding that he was independent in his activities of daily living. *Id.* (citing R. 1032). The ALJ recounted plaintiff's December 2019 hearing testimony that he had been drinking less since he began individual therapy with the VA in May 2019, and had essentially quit drinking a few months prior to the hearing. *Id.* (citing R. 47).

The ALJ based the materiality finding on plaintiff's testimony and report to a mental health professional that drinking made his mental symptoms worse, plaintiff's improved mental health examinations with decreased alcohol intake, and plaintiff's reports of improved mental health with decreased alcohol intake, therapy, and medications. R. 19–26. The ALJ noted that plaintiff was independent in his activities of daily living, and he received only conservative and minimal mental health treatment during the period at issue with no recommendation of hospitalization. R. 25.

With respect to his physical impairments, the ALJ found minimal treatment during the period at issue. *Id.* The ALJ noted that plaintiff had mild carpal tunnel syndrome and some cervical spine tenderness with a reduced range of motion, but that most examinations revealed full strength and a normal gait. *Id.* Due to these findings, the ALJ limited plaintiff to standing or walking for four hours in an eight-hour workday, with limited fingering and handling. *Id.*

The ALJ found the state agency medical opinions—that plaintiff had no substance use abuse; had moderate mental health limitations; and was capable of working at the medium exertional level with frequent postural limitations, unlimited balancing, and occasional climbing of ladders, ropes, and scaffolds—to be unsupported and not persuasive "based on the updated evidence of record, and the fact that the state agency does not address the claimant's alcohol abuse

when assigning limitations." *Id.* The ALJ found plaintiff was more suited to a reduced range of light work based on his allegations of pain. *Id.*

The ALJ addressed Dr. Gonzalez's opinion that, due to plaintiff's chronic pain and fibromyalgia, he could occasionally lift 10 pounds, rarely lift 20 pounds, could sit for less than 2 hours and stand or walk for less than 2 hours in an 8-hour workday, had marked limitation in concentration, persistence, or pace, extreme limitation in daily living, and would miss four or more days per month. R. 26. The ALJ did not find the opinion to be supported or persuasive "based on the medical evidence or record which largely shows normal physical examinations with normal gait." *Id.* The ALJ further found the "minimal treatment [plaintiff received] for physical impairments during the period at issue" did not support the finding that he would miss four or more days per month due to physical impairments. *Id.*

Next, the ALJ addressed Dr. Mason's opinion that plaintiff would miss more than four days per month, and have marked to extreme limitations in interacting with others, responding to changes, dealing with work stress, and maintaining concentration, persistence, or pace. *Id.* The ALJ did not find Dr. Mason's opinion to be supported or persuasive based on the medical record, which "largely shows normal mental status examinations with at most moderate depression," minimal and conservative treatments for mental impairments, and improvement of plaintiff's impairments with therapy and medications. *Id.* The ALJ further noted that Dr. Mason did not indicate if the limitations he described were "due to combined effects of PTSD and alcohol abuse." *Id.*; *see Cothrell v. Berryhill*, 742 F. App'x 232, 236 (9th Cir. 2018) (holding the ALJ did not err in failing to rely on the examining psychologist's opinion that did not discuss the effect of substance abuse on the disability determination despite acknowledging a history of substance use).

39

Lastly, the ALJ addressed the medical reports provided by Dr. Merrill. R. 26. The ALJ notes that Dr. Merrill "does not appear to assess specific functional limitations and instead includes vague limitations such as limiting [plaintiff's] ability to lift and carry or stand and walk." *Id.* For example, Dr. Merrill assessed that "[t]he impact of the knee/lower leg condition(s) on [plaintiff's] ability to work is sitting/standing/ambulating duration, stairs, squatting/kneeling, and running limitations." R. 822. Absent more specific limitations, the ALJ found the opinions to be unpersuasive and unsupported. R. 26. The ALJ noted that Dr. Merrill assessed each impairment "in a vacuum without regard to the effects the impairments may have in relation to each other," based on the VA requirements that are contrary to those of the SSA. *Id.* Nevertheless, the ALJ took into account the examinations and findings of Dr. Merrill when crafting the RFC. *Id.*

The evidence in the record is sufficient for the ALJ to make a decision as to materiality. While plaintiff did not completely abstain from drinking alcohol during the relevant period, he did decrease alcohol intake from twelve beers daily to drinking two to four beers one to two times each week. *See* R. 755, 781, 938, 1046, 1057, 1098. Plaintiff testified that alcohol intensified his PTSD symptoms and did not mix well with his medications "ma[king] things worse." R. 47–48. During his PTSD assessment for his VA rating decision, plaintiff reported continuing to use alcohol "despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of alcohol." R. 935.

Moreover, plaintiff reported the benefits of his decreased alcohol consumption to his health care providers on multiple occasions. *See* R. 1057 ("reported the benefits from not drinking"); R. 1043 (decreased nightmares); R. 1046 (no "anger outbursts" in the past several weeks); R. 1070 (insomnia was resolving); R. 1086 (decreased nightmares). Plaintiff testified in January 2020 that,

40

following his decrease in alcohol consumption, his nightmares were fewer and less intense, his flashbacks were less frequent, and his outbursts due to anger had decreased. R. 47–48, 55–56. In this case, the ALJ relied on plaintiff's representations of substantial improvement in his symptoms when he decreased his alcohol intake, as well as the notations by the medical professionals treating plaintiff during the relevant period regarding his improved condition. This constitutes substantial evidence in the record to support the ALJ's finding that plaintiff's mental health limitations would improve from marked to moderate if plaintiff stopped drinking alcohol. The ALJ's findings comply with the requirements of 20 C.F.R. § 404.1535 and SSR 13-2p, and the ALJ was not required to have an expert review the file to determine materiality.[36]

### 3. The ALJ did not err in failing to alert counsel that substance use would be addressed in determining disability.

Third, plaintiff argues that his counsel "would have requested [a consultative examination] be obtained if there had been an indication that materiality was at issue in this case." Pl.'s Mem. at 13. Plaintiff asserts neither the ALJ nor the doctors preparing the "22 medical opinions" put

---

[36] The Court notes that Social Security Ruling 13-2p provides that the plaintiff "continues to have the burden of proving disability throughout the . . . materiality analysis." 2013 WL 621536, at *4. The Second Circuit found that requiring a claimant to prove materiality accords with Congress's purpose in enacting the statute, explaining:

> Congress sought through the CAAA to discourage alcohol and drug abuse, or at least not to encourage it with a permanent government subsidy. [Placing the burden of proving . . . materiality on the Commissioner] provides the opposite incentive. An alcoholic claimant who presents inconclusive evidence of materiality has no incentive to stop drinking, because abstinence may resolve his disabling limitations and cause his claim to be rejected or his benefits terminated. His claim would be guaranteed only as long as his substance abuse continues—a scheme that effectively subsidizes substance abuse in contravention of the statute's purpose.

*Cage*, 692 F.3d at 124 (citing *Parra v. Astrue*, 481 F.3d 742, 749–50 (9th Cir. 2007)).

him on notice that materiality was an issue. *Id.* at 13–14. The Commissioner asserts "[i]t should have come as no surprise to Plaintiff—who is represented by counsel—that his alcohol use would be at issue in the agency's disability determination," and "[t]he Court should reject Plaintiff's thinly veiled attempt to shift the burden of proof regarding the materiality of his substance use from Plaintiff to the agency." Def.'s Mem. at 19.

"When there is medical evidence of an applicant's drug or alcohol abuse, the 'disability' inquiry does not end with the five-step analysis." *Cage*, 692 F.3d at 123 (citing 20 C.F.R. § 416.935(a)); *see also Delk*, 675 F. App'x at 283. Instead, the regulations require that the ALJ determine whether substance use is a contributing factor material to the finding of disability. *Mitchell*, 182 F.3d at 274 n.2.

Plaintiff's record contains multiple references to plaintiff's excessive use of alcohol, including plaintiff's testimony—in the presence of his counsel—that he has issues with alcohol. R. 47, 159, 933. Dr. Sibilia, the VA doctor who assessed plaintiff's PTSD, diagnosed severe alcohol use disorder, and plaintiff's VA service-connected disability rating decision included plaintiff's "alcohol use disorder." R. 159, 933. Ms. O'Brien also diagnosed plaintiff with severe alcohol disorder. R. 758. These diagnoses constitute medical evidence of plaintiff's alcohol abuse necessitating a materiality finding by the ALJ. Further, the state agency physicians noted that alcohol use was documented in the record, but opined that a materiality determination was not needed due to the assessment that plaintiff was not disabled even considering his alcohol use. R. 100, 116.[37]

---

[37] The state agency opinions comprise four of the twenty-two opinions referenced by plaintiff. *See* Pl.'s Mem. at 13–14. Seventeen of the remaining medical opinions in the record consist of the questionnaires completed by VA doctors evaluating plaintiff's physical impairments, as well as

Plaintiff and his counsel were placed on notice that the ALJ would be required to address materiality. Plaintiff's assertion that the case should be remanded as a result of the ALJ's failure to put him on notice of this issue should be **DENIED**.

## VI.     RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment (ECF No. 13) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 15) be **GRANTED**.

## VII.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.     Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

---

medical source statements addressing plaintiff's fibromyalgia and chronic pain. R. 812–932, 944–952, 954–56. It is not surprising that these opinions, each addressing specific physical impairments, would not address plaintiff's alcohol use. The last opinion is Dr. Sibilia's, who diagnosed alcohol use disorder, putting plaintiff on notice that materiality was an issue. R. 933–43.

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____/s/
Robert J. Krask
United States Magistrate Judge
_____
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
July 30, 2021

44